IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHERI J. KINTZ,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CASE NO. 3:09-cv-1033-MEF
                                         )
UNITED PARCEL SERVICE, INC.              )        (PUBLISH)
                                         )
        Defendant.                       )

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

Plaintiff Cheri J. Kintz ("Kintz") filed suit against her employer United Parcel

Service, Inc. ("UPS") alleging that UPS discriminated against her on the basis of her sex

and disability in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §§ 2000e *et seq*. ("Title VII") and the Americans with Disabilities Act, 42 U.S.C.

§§ 12101 *et seq*. ("the ADA").  This cause is before the Court on UPS's Motion for

Summary Judgment (Doc. # 28), filed September 30, 2010.  For the foregoing reasons,

that motion (Doc. # 28) is GRANTED.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

1331 (federal question) and § 1343 (civil rights).  The parties do not assert that this Court

lacks personal jurisdiction over them, and there is no dispute that venue is proper

pursuant to 28 U.S.C. § 1391(b).

### III. LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56(a)  is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A party may demonstrate the existence of or absence of a genuine dispute as to any material fact by pointing to materials in the record "including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying those evidentiary submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings" and by its own evidentiary submissions or those on file, demonstrate that there is a genuine factual dispute for trial.  *Id.* at 324.  The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary

judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

## IV. FACTS AND PROCEDURAL HISTORY[1]

UPS hired Kintz in 1996.  In 2003, Kitnz became a full time package car driver with the package center in Opelika, Alabama.  (Doc. # 28 Ex. A, Tr. at 35–44).  Package car drivers operate the familiar brown UPS delivery trucks, delivering and picking up packages to and from UPS customers on pre-assigned delivery routes.  (Doc. # 28 Ex. B ¶ 3).  Kintz was still employed with UPS at the time this case was filed.

### A.  *Kintz's injury and alleged disability*

On January 5, 2004, while working as a package car driver, Kintz sustained injuries when a package of lawnmower blades weighing seventy pounds fell from the top shelf of the package car onto her right foot and ankle.  (Doc. # 34 Ex. 1).  Kintz reported her injury to her supervisor Tommy Sanders, who instructed Kintz to continue working. *Id.*  On January 6, 2004, Kintz visited Dr. Kent Klinner who examined her injury and recommended that Kintz return home and keep her foot elevated for the next few days. *Id.* Dr. Klinner also suggested that UPS change Kintz's work restrictions to light duty.  *Id.*

UPS gave Kintz temporary alternate work to do because she was unable to perform

---

[1]  These facts have been culled from the parties' evidentiary submissions (Docs. # 28, 34), keeping in mind that the Court can only consider those pieces of evidence that are capable of presentation in a form that would be admissible into evidence at trial.  *See* Fed. R. Civ. P. 56(c)(2); *Saunders v. Emory Healthcare, Inc.,* 360 F. App'x 110, 112-13 (11th Cir. 2010).

the regular job duties required of a package car driver.  (Doc. # 28 Ex. A, Tr. at 45–46).

However, according to the collective bargaining agreement between UPS and the

International Brotherhood of Teamsters that controls the terms and conditions of Kintz's

employment with UPS (*Id.* at 37–38), Kintz was only entitled to temporary alternate work

for 28 days.  *Id.* at 45–46.  At the end of this 28 day period, Kintz's doctor still hadn't

released her to return to work as a package car driver so Kintz took a workers'

compensation leave of absence.  *Id.* at 46.

Between 2004 and 2006, Kintz was periodically cleared for work by her doctors.

*Id.* at 47–48.  But each time she returned as a package car driver, she would experience

sharp pains in her right leg and would have to go back on leave.  *Id.* at 48, 58.  Kintz

underwent surgery on her right foot in 2006 while under the care of Dr. John Kirchner.

(Doc. # 34 Ex. 3, Tr. at 59).  After healing from the initial surgery, Dr. Kirchner

recommended a second surgery.  *Id.* at 67–68.  Kintz obtained a second opinion about the

surgery from Dr. Angus McBryde.  *Id.*  Kintz did not undergo a second surgery, but

instead began a program of work hardening in March 2007.  *Id.* at 70.  Work hardening is

a type of therapy prescribed to build a patient's strength so that the patient can return to

work.  *Id.* at 63.  In the summer of 2007, Dr. McBryde again cleared Kintz for work, and

she resumed her package car driving duties on June 11, 2007.  *Id.* at 79.

At UPS, delivery routes are assigned through a bidding process which gives

employees with seniority priority in selecting routes.  *Id.* at 82–83.  Employees are not

eligible to bid on a route until they reach a certain threshold of seniority. *Id.* When Kintz left her driving position in 2004 to take a workers' compensation leave of absence, she had not yet accrued enough seniority to obtain a dedicated, assigned package delivery route. *Id.* at 81. However, Kintz accrued seniority while on workers' compensation leave. Therefore, when she returned to work in 2007, she was able to bid on and win an assigned route. *Id.* at 83–85. Upon her return, she immediately began driving her assigned route. *Id.* at 108. But approximately three weeks after returning to work, Kintz began experiencing swelling in her foot and was placed on temporary alternate work in lieu of driving her route. *Id.* at 108–10. On August 14, 2007, Dr. McBryde again cleared Kintz for work as a package car driver. *Id.* at 120–21.

At some point during 2007, Kintz was fitted for a hard plastic brace. (Doc. # 34 Ex. 1). She wears the brace while at work, but does not wear the brace when off-duty. (Doc. # 34 Ex. 3, Tr. at 151). Kintz has trouble walking long distances, up steep inclines, or barefoot. (Doc. # 34 Ex. 1). She experiences pain in her foot, leg, and lower back for which she must take medication. *Id.* The injury forces Kintz to walk with a limp, and one leg is now longer than the other. *Id.* Kintz must wear orthotics in her shoes to compensate for the limp and length difference. *Id.* Dr. McBryde has certified to the Alabama Department of Revenue, Motor Vehicle Division that Kintz is unable to walk two hundred feet without stopping, and cannot walk without the use of a brace. (Doc. # 34 Ex. 22). Dr. McBryde also certified that Kintz suffers from a long-term disability. *Id.*

### B. *Requests for a package car with automatic transmission*

In mid-2007, most of the package cars located at the Opelika UPS center where Kintz worked were equipped with manual transmissions. (Doc. # 28 Ex. B ¶ 3). Package cars are assigned to delivery routes based on the package volume and customer needs associated with each route. *Id.* Since package cars are assigned to specific routes, and most routes are assigned to particular drivers through the seniority-based bidding system, most package cars are operated by the same driver each day. *Id.* When Kintz returned to work on June 11, 2007, her route was assigned to a package delivery car that had a manual transmission system. *Id.* After starting her route on June 11, 2007, she experienced pain and swelling in her foot, which she attributed to having to use a manual transmission truck. (Doc. # 34 Ex. 3, Tr. at 108–10). On June 18, 2007 she requested that UPS provide her with an automatic transmission truck, because the standard transmission was overworking her foot. (Doc. # 34 Ex. 14). Because of the swelling in her foot, she was placed on temporary alternate work on July 2, 2007 and remained on light duty until being cleared again for work as a package car driver on August 14, 2007. (Doc. # 34 Ex. 3, Tr. at 109–10). After being placed on temporary alternate work, Kintz requested a package car with automatic transmission which she believed would be easier to operate with her injury. (Doc. # 28 Ex. B ¶ 8).

Sometime after that, the Opelika package center received new package cars, some of which were equipped with automatic transmissions. (Doc. # 28 Ex. B ¶ 4). Based on

her request and the needs of the package car routes serviced from the Opelika package

center, Kintz was assigned an automatic transmission vehicle soon after her return to

work in August 2007.  *Id.*

Kintz drove the automatic transmission vehicle without incident until June 10

2009.  *Id.* ¶ 5.  On June 9, 2009 Kintz took a day off from work and another driver was

assigned to her route.  (*Id.*; Doc. # 34 Ex. 3 Tr. at 129–32).   The substitute driver

experienced mechanical problems with the package car usually driven by Kintz, and so

the car was taken out of the line up to be serviced.  (Doc. # 34, Ex. 3 Tr. at 130).  The

package car was therefore not available the next day when Kintz reported for work.  *Id.*

By the time Kintz was ready to drive her route on the morning of June 10, no other

package cars with automatic transmissions were available.  *Id.* at 130–32.  Initially,

Kintz's supervisor, Jimmy Holcomb, told Kintz that he could possibly unload the

packages from another automatic-transmission package car and allow Kintz to drive the

emptied automatic-transmission for the day.  *Id.* at 132.  Later, Holcomb rescinded his

offer to unpack the automatic-transmission package car, and instead gave Kintz the

choice between driving a manual transmission for the day or taking a day off of work

with no pay.  *Id.*  Kintz chose the latter option.  *Id.*  When she returned to work on June

11, her usual package car with an automatic transmission was again available for her use.

*Id.* at 137.  Kintz filed a grievance against UPS with her union representative regarding

the June 10, 2009 incident on which her automatic transmission package car was

unavailable.  *Id.* at 127–30.

### C.  Requests to wear short uniform pants

On the recommendation of her doctors, Kintz must wear an orthopedic brace on her right leg at all times while working.  *Id.* at 151.  The brace fits inside Kintz's shoe and extends up the leg to the base of the calf muscle.  *Id.*  In 2007, the UPS dress code policy required that *all* braces worn by UPS employees—whether for temporary or permanent conditions—be covered so as to not be visible.[2]  (*Id.* at 158–59; Doc. # 28 Ex. D ¶ 5).  In accordance with this policy, Kintz was informed by her workers' compensation representative that she would have to wear either long pants or a UPS approved sock to cover her leg brace.  (Doc. # 34, Ex. 3 Tr. at 160).  On her first day back from work after being fitted with the brace Kintz wore a long UPS sock to cover her brace on her right leg, and a short UPS sock on her left.  (Doc. # 34 Ex. 1; Doc. # 34 Ex. 3, Tr. at 181).  Her supervisor informed her that the sock would not be sufficient to satisfy the dress code standard and that she was to wear pants to work in the future.  (Doc. # 34 Ex. 1).  Kintz disliked wearing long pants, as they were too hot in the summer, caught on her brace, and caused her to develop a severe rash that required treatment.  *Id.*

Kintz requested several times that she be permitted to wear shorts with her brace—once via letter to UPS dated April 28, 2008 (Doc. # 34 Ex. 26) and again via letter

---

[2]  Pursuant to the terms and conditions of the collective bargaining agreement between UPS and the International Brotherhood of Teamsters, UPS has the right to establish reasonable standards "controlling personal grooming and appearance and the wearing of uniforms and accessories."  (Doc. # 28 Ex. D ¶ 4).

dated June 26, 2008 (Doc. # 34 Ex. 18).  UPS changed its dress code to allow visible braces on January 27, 2009, and Kintz was given permission to wear shorts with her brace via letter dated February 8, 2009.  (Doc. # 34 Ex. 28).

Kintz alleges that before the UPS uniform policy was changed, several male UPS employees were permitted to wear braces openly, without having to cover them up with long sleeves or pants, including Billy Best, Brad Lindsey, Hunter Carlisle, and Lamar Shoemake.  (Doc. # 34 Ex. 3, Tr. at 187).  According to Kintz, in 2007, Billy Best ("Best") wore a brace to cover a tattoo on his leg, without wearing pants over the brace. *Id.* at 188–93.  Kintz followed Best on his delivery route one day, taking pictures of him wearing his brace with the intention of turning those pictures into UPS management.  *Id.* at 194–95.  Kintz complained to management about Best's visible brace, and thereafter Best did not wear a visible brace.  *Id.* at 191.

Kintz also observed Lamar Shoemake ("Shoemake") wearing a visible knee brace. Once Kintz complained to UPS management about Shoemake's visible brace, Kintz believed Shoemake stopped wearing it or covered it up.  *Id.* at 195–97.  Shoemake admits in his declaration that he did on a few occasions in 2007 wear a visible knee brace, but "[a]s soon as UPS management became aware that I had worn a visible knee brace, I was told that I had to either remove the brace if I wanted to wear shorts or wear long pants that covered the brace."  (Doc. # 28 Ex. E ¶ 3).  After his conversation with UPS management, Shoemake wore pants to cover the knee brace each time it was necessary.

*Id.*

Brad Lindsey ("Lindsey") intermittently wore an ankle brace with short uniform pants, but again, after Kintz complained to her supervisors about Lindsey's brace, Kintz believed he either covered it up or stopped wearing it.  (Doc. # 34 Ex. 3, Tr. at 197–99). In his declaration, Lindsey states that "[a]s soon as UPS management became aware that I had worn a visible ankle brace, I was told that I had to either remove the brace if I wanted to wear shorts or wear long pants that covered the brace pursuant to UPS's appearance policy for uniformed employees."  (Doc. # 28 Ex. C ¶ 3).  After that conversation, Lindsey wore pants each time his ankle brace was necessary.  *Id.*

Kintz also observed Hunter Carlisle committing what she believed was a dress code violation by having an exposed tattoo on his upper ankle.  (Doc. # 34 Ex. 3, Tr. at 199–200).  Kintz is unsure whether or not she reported this violation to her supervisors. Kintz also observed what she believed to be a safety violation when a supervisor named Josh Henderson worked to unload packages from a conveyor belt while on crutches.  *Id.* at 200-02.

### D.  EEOC charge and suit

Kintz suspected that UPS was discriminating against her on the basis of sex and disability, and filed a charge with the EEOC on July 5, 2007.  (Doc. # 34 Ex. 3, Tr. at 143; Doc. # 1 Ex. A).  Kintz included on the EEOC charge complaints that (1) UPS denied her request to wear short pants, instead of the long pants required to cover her leg

brace; (2) that she had requested an automatic-transmission package car to drive; and (3) that male co-workers were permitted to wear exposed braces while Kintz was not permitted to do so.[3]  (Doc. # 1 Ex. A).  The EEOC issued a Notice of Right to Sue on September 1, 2009.  (Doc. # 1 Ex. B).

Kintz filed suit against UPS on November 10, 2009, alleging discrimination on the basis of sex and disability in violation of Title VII and the ADA.  (Doc. # 1).  Kintz has voluntarily dismissed two of her original five claims (Doc. # 35 at 9 n.1) leaving the following allegations:

> Count 3: UPS violated 42 U.S.C. § 12112(b)(3) by utilizing standards and criteria with regard to dress code that have the effect of discriminating on the basis of disability.
>
> Count 4: UPS violated 42 U.S.C. § 12112(5)(a) by denying Kintz reasonable accommodations which would have allowed her to safely perform the essential functions of her position with UPS.
>
> Count 5: UPS violated the provisions of Title VII by treating men more favorably than women.  For example, UPS allowed men to wear orthopedic braces with short pants while Kintz was required to wear long pants to cover her brace.

(Doc. # 1).  Presumably, Count 4 applies to three factual scenarios: (1) the two to three week period in June and July 2007 in which Kintz's requests for an automatic transmission package car were denied; (2) the time period from August 2007 to January

---

[3] Kintz also alleged in her EEOC complaint that UPS had taken too long to send someone to help her on July 2, 2007 when she experienced swelling in her foot.  (Doc. # 1 Ex. A).  This factual allegation does not appear elsewhere and, therefore, is presumed not to form the basis of one of the counts alleged in the complaint.

27, 2009 during which Kintz's requests to wear short uniform pants were denied; and (3) the incident on June 10 when Kintz's request for a replacement automatic transmission package car was denied.

Kintz also references 42 U.S.C. § 1981a in paragraph 1 of her complaint, and presumably seeks damages under § 1981a in addition to any relief she may be entitled to under 42 U.S.C. § 2000e-5.  UPS moved for summary judgment as to all of Kintz's claims on September 30, 2010.  (Doc. # 28).

## V.  DISCUSSION

Kintz's remaining claims include two which allege violations of the ADA and one which alleges violations of Title VII.  These will be discussed independently.

### A.  *Kintz's ADA claims:*

Kintz has brought two claims of discrimination under the ADA.  As a threshold matter, the parties seem to agree that the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) is inapplicable to the facts of this case.  (See Doc. # 29 at 13 and Doc. # 35 at 12 n.3).  The ADAAA changed the applicable standard for establishing "disability."  Under the pre-amendments ADA, "disability" was defined as a "physical or mental impairment that substantially limits one or more major life activities of an individual."  42 U.S.C. § 12102 (2008).  When determining whether or not an impairment substantially limits a major life activity under the old standard, individual "measures to correct for, or mitigate, a physical or mental impairment . . . must be taken into account."

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999).

The text of the ADAAA instructs, however, that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medical supplies, equipment, or appliances."  42 U.S.C. § 12101(4)(E).  The determination of which definition applies is an important one in this case, as Kintz's ability to walk is affected by the use of her brace. Several courts within the Eleventh Circuit have decided that the ADAAA does not apply retroactively to discrimination occurring before the amendments' effective date on January 1, 2009.[4]  This Court agrees that the ADAAA does not apply retroactively.

As the parties agree that the ADA is the law applicable to all of Kintz's disability claims, this court will apply the ADA without explicitly deciding that the ADA is the correct statute to apply to each of these individual disability claims.

### 1.  *Count 3—UPS's dress code has a disparate impact on disabled employees*

---

[4]  The unpublished per curiam Eleventh Circuit decision in *Shannon v. Potter* said that "this court has not yet issued a published opinion addressing the potential retroactive effect of the ADAAA." 335 Fed. App'x 21, 25 (11th Cir. 2009).  However, in an unpublished per curiam opinion released before *Shannon*, the Circuit indicated that "absent any Congressional expression to the contrary, a presumption against retroactive application" exists, and "we look to the ADA as it was in effect at the time of the alleged discrimination."  *Fikes v. Wal-Mart, Inc.*, 322 Fed. App'x 882, 883 n.1 (11th Cir. 2009). Several district courts have refused to apply the ADAAA retroactively.  *See, e.g. Richardson v. Honda Mfg. of Ala., Inc.*, 635 F. Supp. 2d 1261, 1272 (N.D. Ala. 2009); *Lawson Plantation Gen. Hosp., L.P.*, 704 F. Supp. 2d 1254, 1272–73 (S.D. Fla. 2010).

The ADA defines discrimination as including the use of "selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" unless such criteria are "shown to be job-related for the position in question and [are] consistent with business necessity."  42 U.S.C. § 12112(b)(6) (2008). Disparate impact claims, which are cognizable under the ADA, are those claims which "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Raytheon v. Hernandez*, 540 U.S. 44, 52–53 (2003).  Unlike for a disparate treatment claim, a plaintiff bringing a disparate impact claim need not present evidence of discriminatory intent.  *Id.* at 53.  Instead, the plaintiff must present two kinds of evidence to establish a prima facie case.  First, the plaintiff must point to the specific employment practice that allegedly has a disparate impact.  *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1314 (11th Cir. 1999).  Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination.  *See id.*; *Hallmark Developers v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006).

While "no single test controls in measuring disparate impact," the plaintiff must produce some evidence about the population that a policy applies to, some numbers or proportional statistics, in order to survive a motion for summary judgment.  *Hallmark Developers*, 466 F.3d at 1286.  Here, Kintz relies only on her conclusory statement that

the UPS dress code policy in effect before January 2009 which required that all braces be covered by UPS approved uniforms "had the effect of screening out persons with disabilities."  (Doc. # 35).  She points to no evidence that could indicate the alleged disparate impact of the dress code policy.  Instead, she points to two employees who were also instructed to remove or cover their braces—Brad Lindsey and Lamar Shoemake—who both attest that they are not disabled.  (Doc. # 34 Ex. 3).  Lindsey states in his declaration that he wears a brace to treat an occasional ankle condition, but that he has never considered himself to be disabled.  (Doc. # 28 Ex. C).  Likewise, Shoemake states in his declaration that he has a knee condition which occasionally forces him to wear a brace.  (Doc. # 28 Ex. E).  However, he has never considered himself to be disabled.  *Id.*  Evidence that non-disabled employees were also subject to the dress code policy Kintz complains of tends to refute her conclusion that the policy unfairly screens out disabled employees. She has provided no evidence to the contrary.

Therefore, Kintz has not met the non-movant's burden of demonstrating that there is a genuine dispute as to a material fact, and UPS is entitled to summary judgment on Count 3 of Kintz's complaint.

### 2. Count 4—Failure to accommodate

The ADA provides that an employer unlawfully discriminates against an employee with a disability when the employer fails to provide reasonable accommodations, unless doing so would impose undue hardship on the employer.  42 U.S.C. § 12112(b)(5)(A).

15

To show a prima facie case of discrimination, a plaintiff must show that (1) she is disabled, (2) she is a qualified individual, and (3) that she was discriminated against because of her disability by way of the defendant's failure to provide a reasonable accommodation. *Lucas v. W.W. Gainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *McKane v. UBS Fin. Servs, Inc.*, 363 Fed. App'x 679, 681 (11th Cir. 2010).

### a. Disability

Disability is defined three different ways in the ADA:

(A) a physical or mental impairment that substantially limits one or more

major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2008). Courts are guided by the regulations promulgated by the EEOC when applying the provisions of the ADA. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 n.1 (11th Cir. 1998). These regulations provide that walking is considered to be a major life activity as that term is used in the ADA. 29 C.F.R. § 1630.2(i). The term "substantially limits" is defined as "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). When determining whether or not an individual is substantially limited

in their ability to perform a major life activity, courts must consider how the individual functions with the aid of any mitigating or corrective measures. *Sutton*, 527 U.S. at (1999). Additionally, courts must look to (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

The burden of establishing disability is the plaintiff's and the burden is a heavy one. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2000) ("[T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled . . .").

It is undisputed that Kintz suffers from an impairment in her right leg. Therefore, the question for this Court is whether Kintz's impairment substantially limits a major life activity. Specifically, Kintz alleges that her leg impairment substantially limits her ability to walk. (Doc. # 35 at 13). She experiences pain when walking long distances and is forced to stop and rest often, perhaps even after walking only 200 feet.[5] (Doc. # 34 Ex. 1). She also has trouble walking up and down steep surfaces. *Id.* Dr. McBryde's clinic

---

[5] The Court is to consider Kitnz's ability to walk while she is wearing her brace. *Sutton*, 527 U.S. at 482. However, she does not state in her declaration whether the pain she describes is experienced with or without her brace to support her. As the non-movant, she is entitled to have all inferences drawn in her favor, and therefore the Court will assume that the pain she experiences occurs even when wearing her brace. *See Anderson*, 477 U.S. at 255 (1986).

note dated June 6, 2007 describes Kintz's condition as "a permanent partial impairment of 55%" and states that she "has reached maximum medical improvement." (Doc. # 34 Ex. 12). McBryde also stated that Kintz may possibly have to wear the brace on her leg indefinitely. *Id.* Kintz also applied for a handicapped parking placard, albeit after the time period within which one of her claims of discrimination arose. (Doc. # 34 Ex. 21) (application dated August 13, 2007); *see Morales v. Ga. Dep't of Human Res.*, 2010 WL 4639279, *3 (M.D. Ga. Nov. 8, 2010) (considering plaintiff's lack of handicapped parking sticker as evidence that she was not disabled at time of alleged discrimination). In the same application, Dr. McBryde certified that Kintz suffers from a long-term disability, cannot walk two hundred feet without stopping to rest, and cannot walk without the assistance of her brace. (Doc. # 34 Ex. 21).

UPS argues in its motion for summary judgment that because Kintz can perform her job duties, which include walking for long distances and for long periods of time, she is not substantially limited in her ability to walk. However, the Court cannot assume from Kintz's ability to perform her job that she is not disabled. UPS provides no information about how long and far Kintz is required to walk on her route, how often she rests, etc. This Court finds that Kitnz has created a genuine dispute of fact as to whether she qualifies as a disabled individual under the ADA.

### b. *Qualified individual*

UPS does not contest that Kintz meets the definition of qualified individual under either the ADA or the ADAAA, and therefore the Court will assume for purposes of this memorandum opinion that she is in fact a qualified individual.

### c. *Reasonable accommodation*

An accommodation can qualify as reasonable, and therefore be required by the ADA, only if the accommodation "enables the employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1256.  The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions.  *Id.* at 1255.  Once the plaintiff has met that burden, the defendant can present evidence demonstrating that providing the accommodation would impose an undue hardship on the operation of its business.  *See* 42 U.S.C. § 12112(b)(5)(a).

Kintz has alleged three different instances in which UPS failed to accommodate her disability—by failing to provide an automatic transmission package car between June 11, 2007 and July 2, 2007; by refusing to allow her to wear short uniform pants with her brace before January 2009; and by refusing to provide an alternate automatic transmission package car on June 10, 2009.  These will be discussed independently.

### i. *Request for an automatic transmission package car*

19

UPS argues in its motion for summary judgment that any delay in providing Kintz with an automatic transmission package car cannot legally constitute a violation of the ADA.  This Court agrees.

Kintz returned to work as a package car driver on June 11, 2007.  At that time she started driving a standard transmission vehicle.  Kintz requested an automatic transmission package car on June 18, 2007 via letter.  (Doc. # 34 Ex. 14).  On July 2, 2007, she was placed back on temporary alternate work, and did not drive a package car again until August 14, 2007.  (Doc. # 34 Ex. 3, Tr. at 118–20).  Kintz's claim of discrimination can only be based on the period of time between her request for accommodation and the time at which that accommodation was granted—between June 18, 2007 and August 14, 2007.[6]  However, any delay in granting an accommodation is properly reduced by the amount of time that Kintz was on temporary alternative duty.  *See Terrell v. USAir, Inc.*, 955 F. Supp. 1448, 1454 (M.D. Fla. 1996), *aff'd*, 132 F.3d 621 (11th Cir. 1998).  Therefore, the true delay in providing an accommodation is between June 18, 2007 and July 2, 2007—a total of only 15 days.

Longer delays have been found not unreasonable under the ADA.  *Terrell*, 955 F. Supp. at 1454 (holding a three month delay in implementing accommodation was not unreasonable as a matter of law); *Hartsfield v. Miami-Dade Cnty.*, 90 F. Supp. 2d 1363,

---

[6] An employer's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 2007).

1373 (S.D. Fla. 2000) (finding that a delay of a few months was not unreasonable, even considering the amount of delay due to lost paperwork); *Ungerleider v. Fleet Mortg. Grp. of Fleet Bank*, 329 F. Supp. 2d 343, 355 (D. Conn. 2004) ("[F]ailure to immediately provide [plaintiff] with the specific accommodation that she sought does not constitute refusal to provide a reasonable accommodation . . ."). UPS's delay of a mere 15 days is not unreasonable under the ADA, and therefore Kintz cannot claim that UPS failed to accommodate her needs.

Kintz also seems to argue that UPS's failure to follow its own ADA compliance guidelines is evidence that UPS was not "interested in accommodating Kintz." (Doc. # 35 at 26). However, a failure to follow the letter of one's own ADA compliance guidelines is not made unlawful by the ADA. UPS provided Kintz with her requested accommodation with only a 15 day delay. The delay would have likely been even longer had UPS used an interactive process as suggested by the EEOC regulations. *See* 29 C.F.R. 1630.2(o)(3). UPS has established that it is entitled to judgment as a matter of law on this particular claim of discrimination, and therefore summary judgment is due to be granted as to this iteration of Claim 4 of Kintz's complaint.

### ii.   *Failure to allow Kintz to wear short uniform pants*

Kintz also claims that UPS failed to accommodate her by refusing to allow her to wear shorts. UPS argues that Kintz's desire to wear shorts was merely a preference, and was not necessary to enable her to perform the essential functions of her job. In support

of her contention that an accommodation is necessary to enable Kitnz to perform her job duties, Kintz provides the following evidence in her declaration—the brace gets caught on her pants, sometimes causing her to trip; the brace catches on the pants, which slows her work pace down; the combination of the summer heat, the pants, and the brace caused Kintz to develop a rash on her leg that caused her to miss a few days of work.[7]  (Doc. # 34 Ex. 1).   However, during her deposition, Kintz admitted that after returning for work in August 2007, she has been able to perform all of the essential functions of her job without having to take any leave related to her ankle during the rest of 2007.  (Doc. # 34 Ex. 3, Tr. at 122–23).  There is no evidence in the record to suggest that Kitnz was unable to perform her job equally as well in the year 2008, up until the dress code policy was changed in January 2009.

While Kintz may prefer to wear shorts with her brace at work, she has not presented enough evidence here to demonstrate that wearing shorts was necessary in order for her to perform the essential functions of her position as a package car driver. Accordingly, her request to wear shorts does not qualify as a reasonable accommodation, and therefore UPS was not legally required to permit Kintz to wear shorts.  *See Lucas*, 257 F.3d at 1256.  Therefore, UPS is entitled to summary judgment on this iteration of

---

[7]  While Plaintiff's brief is not clear in this regard, it appears that Kintz was treated by the Auburn Dermatology and Skin Cancer Center for a rash sometime in mid-August 2007, before she began driving an automatic transmission package car.  (Doc. # 34 Ex. 13).  There is no evidence in the record to indicate that she has needed treatment for any other rash since then.

Kintz's claim of discrimination.

### iii.  Failure to provide an alternate package car on June 10, 2009.

Kintz may also be raising a claim of discrimination based on the events surrounding June 10, 2009.  As described above, Kintz's usual automatic transmission package car was out of service, and undergoing repairs on June 10, 2009.  Kintz requested that another automatic transmission package car be provided so that she could complete her shift.  The only automatic transmission trucks available had already been loaded with packages by the time Kitnz's request was made.  UPS management decided that instead of unloading and then reloading another truck, Kintz would have to either drive the manual transmission truck or take an unpaid day off from work.  Kintz chose to take an unpaid day off.  The next day her automatic transmission truck was back in service and available for her to use.

As described above, a delay of only one day in failing to provide the requested accommodation is not unreasonable under the ADA and, therefore, cannot form the basis of a claim for discrimination.   *Terrell*, 955 F. Supp. at 1454.

Even assuming that Kintz could establish that providing her with an automatic transmission package car on June 10, 2009 was a reasonable accommodation that UPS was required to make, UPS has presented evidence that doing so would have imposed an undue hardship on the business that day.  James Holcomb, the Opelika package center manager, stated in his declaration that on the date of June 10, 2009, all of the other

automatic transmission cars at the center were in use and already loaded with packages. In order to allow Kintz to drive an automatic transmission car on her route, which was assigned to her in accordance with the terms of the collective bargaining agreement, another package car would have to be unloaded.  Then, the packages for Kintz's route would have to be loaded into the alternate car, and all of the alternate car's packages loaded into an available standard transmission truck.  All of this would be required so that Kintz could drive an automatic transmission truck for a single day.

UPS has established that providing Kintz an automatic transmission package car for June 10, 2009 would have imposed an undue burden on the business.  Therefore, UPS was not required to provide Kintz with the requested accommodation.  To the extent that Kintz even argues this factual scenario gives rise to a claim of discrimination under the ADA, the Court finds that UPS is entitled to summary judgment on that claim.

### B.  Kintz's Title VII claims

Kintz also brings a claim based on alleged violations of Title VII.  Specifically, she argues that UPS's dress code policy requiring that all visible braces be covered by an approved article of UPS clothing was enforced against her but not against her male co-workers.

In order to establish a prima facie case of sex discrimination based on circumstantial evidence, a plaintiff must establish that (1) she belongs to a protected class; (2) that she was subjected to an adverse employment action; (3) her employer treated

24

similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).

Here, it is undisputed that as a woman, Kintz is a member of a protected class. It is also undisputed that Kintz was qualified to do her job. UPS does argue, however, that Kintz can present no evidence to establish the existence of an adverse employment action or similarly situated employees who were treated more favorably.

### 1. *Adverse employment action:*

There is no bright line test for establishing when alleged discrimination rises to the level of an adverse employment action. *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (holding that whether an action is sufficient to constitute an adverse employment action must be determined on a case-by-case basis). In order to be considered adverse, an employment action must cause a serious and material change in a term, condition, or privilege of employment. *Davis*, 245 F.3d at 1239. The employee's subjective view of the employment action is not controlling. *Id.* Instead, the court must consider whether the employment action would be materially adverse as viewed by a reasonable person. *Id.* Courts are reluctant to find that an employment action is adverse if the salary, benefits, hours, and responsibilities of the position remain unchanged. *See id.* ("Although the statute does not require proof of direct economic consequences in all cases, the asserted

impact . . . must at least have a tangible adverse effect on the plaintiff's employment.");

*Sampath v. Immucor, Inc.*, 271 Fed. App'x 955, 962 (2008) (finding that employee who

had been transferred to a different department, but whose salary, benefits, and hours

remained unchanged could not demonstrate adverse employment action); *Hyde v. KB*

*Home, Inc.*, 355 Fed App'x 266, 270 (11th Cir. 2009) (a reduction in work assignments

alone did not rise to the level of adverse employment action without an accompanying

change in title or salary).

Kitnz has provided no evidence to support her contention that forcing her to

comply with UPS's dress code, which on its face applied to both men and women equally,

subjected her to an adverse employment action.  UPS did not change Kintz's title, hours,

responsibilities, route, or salary.  Nor was Kitnz subjected to discipline for her non-

compliance with the dress code.  Having to wear long uniform pants, even in the hot

summer months, does not amount to an adverse employment action.  Therefore, Kintz's

claim of sex discrimination brought pursuant to Title VII cannot survive, and UPS is

entitled to summary judgment.[8]

## VI.  CONCLUSION

---

[8]  In the alternative, this Court finds that Kintz has not presented any similarly situated employees who were treated more favorably than she was.  Upon learning that Best, Lindsay, and Shoemake were violating UPS dress code policies, UPS management instructed the men to either remove their braces or cover them up. Kintz does not allege that the men were ever given permission by UPS management to wear visible braces.

For the foregoing reasons, UPS is entitled to summary judgment on each of Kitnz's claims of discrimination.  Therefore, it is hereby ORDERED that:

(1)  Defendant UPS's Motion for Summary Judgment (Doc. # 28) is GRANTED.

(2) The pretrial conference set for February 10, 2011 and trial set for March 7, 2011 are CANCELLED.

 The Court will enter a separate final judgment consistent with this Memorandum Opinion and Order.

DONE this the 7th day of February, 2011.


_____
        /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE